IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 4, 2005

## STATE OF TENNESSEE v. GERMAINE MCKENZIE

**Appeal from the Criminal Court for Shelby County**
**No. 03-02542 Chris Craft, Judge**

_____

**No. W2004-02359-CCA-R3-CD  - Filed November 10, 2005**

_____

The appellant, Germaine McKenzie, was convicted by a Shelby County jury of the offense of second degree murder. As a result of the conviction, the appellant was sentenced to twenty-four years, to be served at one hundred percent incarceration. The appellant appeals his conviction, challenging the sufficiency of the evidence. After a thorough review of the record and applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES, and ALAN E. GLENN, JJ., joined.

Garland Erguden, Memphis, Tennessee, for the appellant, Germaine McKenzie.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and James Lammey and Michelle Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On April 22, 2003, the Shelby County Grand Jury indicted the appellant with the first degree murder of Nina Benton. At trial, the following evidence was presented.

On Monday, September 23, 2002, Jacqueline Jamerson spoke to Ms. Benton on the telephone at work at approximately 3:00 p.m. The two women planned to take their children to the fair the following evening. The next day, Ms. Benton failed to pick up her children from school and the babysitter. She also failed to meet Ms. Jamerson as planned. Ms. Jamerson drove by Ms. Benton's babysitter's house and discovered Ms. Benton's daughter was still there. Ms. Jamerson drove by Ms. Benton's apartment around 4:30 p.m. She did not see Ms. Benton's car. Ms. Jamerson left and

returned around 5:30 p.m. with the babysitter's husband, Tim. The two knocked on the door to Ms. Benton's apartment, but no one answered. After being unable to locate Ms. Benton, Ms. Jamerson called the victim's mother's home where she spoke with Ms. Benton's sister, Sylvia Curtis.

Suzanne Clark, Ms. Benton's aunt, testified that she learned around 6:00 p.m. on September 24, 2002, from Emma Curtis, Ms. Benton's mother, that Ms. Benton was missing. The two women drove to Ms. Benton's apartment together. The maintenance crew at the apartment complex helped the women gain access to the apartment. Once they entered the apartment, they discovered that Ms. Benton was not inside. Her television and DVD player were missing.[1] The women returned to Ms. Clark's residence, where they called the police to report that Nina Benton was missing.

Sylvia Curtis testified that she had seen Ms. Benton several days earlier when Ms. Benton and the appellant stopped by her apartment to pick up a cell phone. Ms. Curtis purchased the cell phone for Ms. Benton by fraudulent use of a stolen check.[2]

When Ms. Clark learned that Ms. Benton was with the appellant several days prior to her disappearance, she began making phone calls in attempt to locate the appellant. Ms. Clark testified that she called Ray Ball, the father of Ms. Benton's daughter, to ask him if he had an address or telephone number for the appellant. Mr. Ball, the appellant, and Ms. Denton had previously worked together at an O'Charley's Restaurant in Memphis and were friends. After getting a telephone number, Ms. Clark called the number and told the person that answered the phone that she was looking for the appellant. Several hours later, Ms. Clark was contacted by the appellant. The next day, Ms. Clark located the appellant at 5181 Watkins Street. When she arrived at the address, she saw the appellant in the driveway next to a Chrysler that was backed into the driveway close to the garage doors. Ms. Clark stated that she saw cleaning supplies and that it looked as if the appellant was getting ready to wash the car. Ms. Clark testified that it was odd that the appellant was washing his car because it was a cloudy day, and it was starting to drizzle rain as she approached the appellant.

Ms. Clark approached the appellant. As she walked toward the car, the appellant looked into the back seat of the car. The appellant then reached into the back seat of the car, pulled out a black sweatshirt, put it on over his tee shirt, and walked toward her. Ms. Clark identified herself as the victim's aunt, and asked the appellant if he had seen the victim. The appellant told her, "Now, see, there, Raymond [Mr. Ball] is trying to put this all on me." When Ms. Clark asked the appellant what he meant, he asked her if Mr. Ball told her that "he kicked her [the victim's] door in that Saturday."

---

[1] John Mayr, an employee of Reliable Pawn and Curio, formerly known as Belmar Pawn, testified that the appellant pawned an RCA television with serial number 040537344 for $50 at 4:17 p.m. on September 23, 2002. The RCA television was later identified by Timothy Garrett, the RentACenter store manager, as the television purchased by the victim on April 23, 2002.

[2] Tabitha Bender, customer operations manager for Cricket Communications, testified that on September 24, 2002, the cell phone was activated by an individual who identified himself as the appellant.

Ms. Clark stated that she did not know what the appellant was talking about. The appellant informed Ms. Clark that he took Ms. Denton home from work on September 23, 2002, and that he drove off after she entered her apartment and turned on the kitchen light.

Several days after Ms. Denton was reported missing, the appellant signed a consent form allowing law enforcement personnel to search his vehicle, a 1998 Chrysler Concorde. During a search of the appellant's car, the police recovered a pair of blue and white tennis shoes that appeared to have blood stains on them. The police also removed a piece of carpet from the floor of the vehicle that was soaked with some type of fluid.

On September 30, 2002, Captain James L. Fitzpatrick of the Memphis Police Department attempted to execute a search warrant for 5181 North Watkins Street, the home of the defendant's mother and step-father. No one was home, so he and the other officers went to the back side of the property, where they located Nina Denton's remains in a shallow grave. She was partially clothed and lying in a fetal position. Captain Fitzpatrick testified that when the body was removed from the shallow grave, a shell casing was found underneath the body. Additionally, in the area surrounding the body, police recovered some shell casings, a ring, bullet fragments and a red button. Further, all of the shell casings were consistent with having been fired from the same weapon.

Dr. O.C. Smith, the Shelby County Medical Examiner, testified that he was called to the scene at 5181 North Watkins Street on September 30, 2002. Upon arriving, Dr. Smith observed the victim's body partially buried in a shallow grave in a wooded area. There were several branches covering the grave.

According to Dr. Smith, the body was in a state of decomposition. As a result, the condition of the DNA was affected. Dr. Smith identified the body as that of an African-American female weighing 207 pounds. Based on the state of decomposition, Dr. Smith opined that the victim had been dead from three to seven days and died as a result of multiple gunshot wounds.

Special Agent Donna Nelson of the Tennessee Bureau of Investigation testified as an expert in serology and DNA. Special Agent Nelson analyzed the blood standards of the appellant, the victim's mother, the victim's daughter, and Mr. Ball as well as the complete DNA recovered from the appellant's tennis shoes and the partial DNA recovered from the piece of carpet the police obtained from the appellant's car. Agent Nelson sent her results to a private lab for further DNA testing. However, Agent Nelson was able, through her own testing, to exclude the appellant as a contributor to the blood on the shoe and the carpet.

Marsha Garcia of Orchard Cellmark identified herself as a forensic DNA analyst. She received the DNA information from Special Agent Nelson. According to Ms. Garcia, she performed calculations to show the relationship with the DNA found on the tennis shoes as compared to the victim's child to the relationship between the victim's mother and the DNA found on the tennis shoes. Based on Ms. Garcia's calculations, Ms. Garcia testified that it was 4.9 million times more

likely than not that the DNA found on the shoes belonged to the mother of Nina Denton's child when compared to a random untested individual.

The appellant took the stand in his own defense. He claimed that Ms. Denton was his best friend and that he did not kill her, but knew who was responsible for her death. The appellant detailed his relationship with Ms. Denton and Mr. Ball, stating that the three first met while working together at an O'Charley's Restaurant. They were close friends. Mr. Ball and Ms. Denton eventually began a romantic relationship. According to the appellant, Mr. Ball and Ms. Denton had a daughter together. The appellant also indicated that he had witnessed several physical altercations between Ms. Denton and Mr. Ball. He himself had been punched in the face by Mr. Ball on one occasion when he tried to intervene. Additionally, the appellant claimed that Mr. Ball was a member of the Gangster Disciples and had once invited the appellant to join the gang.

The appellant admitted that he was incarcerated in the late 1990s for kidnapping, misdemeanor theft, felony theft, passing a bad check and fraudulent use of a credit card. During his incarceration, Mr. Ball and Nina Denton visited him and accepted his telephone calls. Ms. Denton also wrote letters to the appellant while he was incarcerated. At one point, the letters became romantic. The appellant claims that during one telephone call, Mr. Ball threatened to kill him while he was incarcerated. Mr. Ball told the appellant to stop calling Ms. Denton. The appellant claims that he called 911 when he heard Ms. Denton scream that Mr. Ball had a gun. After the appellant was released from prison, he claimed that his relationship with Mr. Ball was not the same, but that he and Ms. Denton were still best friends.

The appellant testified that Ms. Denton called him on September 20, 2002, claiming that she got into a fight with Mr. Ball, during which he kicked in the side of her car. After that fight, Ms. Denton started parking her car on the opposite side of the apartment complex. The appellant claimed that Ms. Denton called him on September 23, 2002, to ask for a ride to and from work. The appellant stated that he picked her up prior to lunch and borrowed her television, promising to return it within 24 hours. The appellant planned to pawn the television for money to gamble with at the casinos in Tunica, Mississippi. The appellant took Ms. Denton to the bank to cash her paycheck and dropped her off at work. The appellant claims that he immediately went to pawn the television and went to Tunica to gamble, coming back to Memphis in time to pick up Ms. Denton from work at 11:30 p.m.

When the appellant picked up Ms. Denton at work, the appellant claims that the two made a brief stop at Ms. Curtis' house to pick up Ms. Denton's new cell phone before he took her home. When they arrived at her apartment, the appellant claimed that he saw a man outside standing by the stairs leading to Ms. Denton's apartment. The appellant commented that the man's shape "reminded" him of Mr. Ball. The victim asked the appellant to wait, got out of the car, approached the man and exchanged words with the man before the man grabbed Ms. Denton and put a gun to her head.

At that point, the appellant claims that two men approached him with guns drawn, demanding he exit the vehicle. The appellant stated that a pillowcase was placed over his head and that he was put in the backseat of an Oldsmobile 88, and driven around for about thirty minutes. He was then taken into a house with five men and shown photographs of his mother and little brother. The appellant testified that the men threatened to kill his mother and little brother if he said anything about Mr. Ball or what happened that night.

The appellant claimed that the men next put him back into the car and took him to a wooded area. When they removed the pillowcase from his head, he saw trees, an Oldsmobile Cutlass, and an Oldsmobile 88 and the same five men. The men threatened to shoot him in the head, then dumped the body of the victim at his feet. According to the appellant, the men handed him a shovel and told him to start digging. The appellant testified that he dug for a moment before he started crying and stopped digging. The men beat him and then told him that they were standing in the woods behind his parent's home. According to the appellant, the men told him that if he said anything about Nina Denton's death, that her body parts would end up in his front yard.

Next, the appellant claimed that the men dropped him off at his car which had been moved to a Circle K convenience store. At that point, the appellant stated that he was afraid to call the police or go home, so he spent the night at the Rose Motel.

The next morning, the appellant stated that he activated Ms. Denton's cell phone, drove to his mother's house and walked down into the woods to see Ms. Denton's body. The appellant admitted that he initially lied to the police but that he eventually told them where to find Nina Denton's body.

Mr. Ball testified that he was in a relationship with Ms. Denton and that the two had a daughter together. He denied ever slapping or hitting her, claiming instead that all of their arguments were verbal. Mr. Ball admitted that he and Ms. Denton had an oral altercation on September 20, 2002, outside his sister's home after Mr. Ball asked Ms. Denton if she was seeing the appellant. At the conclusion of the argument, Mr. Ball kicked Ms. Denton's car door as she drove away. Mr. Ball denied being jealous of the appellant, explaining that he did not want the appellant around his child or Ms. Denton because of his prior criminal activity. Mr. Ball denied having anything to do with the disappearance or death of Nina Denton.

At the conclusion of the proof, the jury found the appellant guilty of the lesser-included offense of second degree murder for the death of Nina Denton. The trial court sentenced the appellant to twenty-four years incarceration, to be served at one hundred percent incarceration. The appellant filed a timely motion for new trial, alleging various grounds, which the trial court denied after a hearing. The appellant subsequently filed a timely notice of appeal, challenging the sufficiency of the evidence.

<u>Analysis</u>

On appeal, the appellant challenges the sufficiency of the evidence to support his conviction for second degree murder. Specifically, the appellant argues that the evidence is insufficient to support his conviction beyond a reasonable doubt. However, the appellant concedes that there is evidence to support his conviction in light of his admission of having helped to bury the victim's body. The State contends that the evidence is sufficient to support the appellant's conviction.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. <u>State v. Cazes</u>, 875 S.W.2d 253, 259 (Tenn. 1994); <u>State v. Harris</u>, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. <u>Id.</u> The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. <u>See</u> Tenn. R. App. P. 13(e); <u>Harris</u>, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." <u>See</u> <u>Tuggle</u>, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. <u>State v. Morgan</u>, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); <u>State v. Matthews</u>, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Along those same lines, questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are to be resolved by the trier of fact. <u>State v. Pruett</u>, 788 S.W.2d 559, 561 (Tenn. 1991). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." <u>Matthews</u>, 805 S.W.2d at 779.

Further, a conviction may be based entirely on circumstantial evidence when the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." <u>State v. Smith</u>, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting <u>State v. Duncan</u>, 698 S.W.2d 63, 67 (Tenn. 1985)). If the trier of fact can determine from the proof that all other reasonable theories except that of guilt are excluded, the evidence is sufficient.

In the case herein, the appellant was convicted of second degree murder. Second degree murder is a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result . . . ." Tenn. Code Ann. § 39-11-106(a)(20).

Although largely circumstantial, we determine that the evidence in the record is more than sufficient to support the appellant's conviction for second degree murder. The proof at trial demonstrated that the appellant was the last person to be seen with the victim. The appellant

activated the victim's cell phone after he knew that she was dead. Further, the victim's partially clothed body was discovered in the appellant's back yard with four shell casings, all consistent with having been shot from the same gun. The appellant informed police of the location of the victim's body and admitted that he assisted in burying the victim as well as visiting the grave site once in the days after the murder took place. Further, through the testimony of the DNA analyst, there was strong evidence that the victim's DNA was on the appellant's shoes, and that only one out of 4.9 million people had the same DNA type as that found on the appellant's tennis shoes. The evidence, as presented, points the finger of guilt unerringly at the appellant. The jury was amply justified in concluding that the appellant was guilty of second degree murder. This issue is without merit.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____

JERRY L. SMITH, JUDGE